[No. 22708. Department One. January 8, 1931.]

PAUL T. PAULSEN, *Appellant,* v. ROBERT A. GILMORE, *Respondent.*[1]

*Lewis & Church* and *Preston, Thorgrimson & Turner,* for appellant.

*Trumbull, Severyns & Trumbull,* for respondent.

PARKER, J.—The plaintiff, Paulsen, seeks recovery from the defendant, Gilmore, of claimed balances due upon the sale prices upon two automobile service businesses, including physical property and leasehold tenancies pertaining thereto, under contracts by which he agreed to sell and Gilmore agreed to purchase the businesses. The cause proceeded to trial in the superior court for Clallam county, sitting without a jury, resulting in findings and judgment denying to Paulsen any recovery, from which he has appealed to this court.

We think the considerably involved controlling facts of this controversy may be sufficiently summarized as follows: For several years preceding the making of the sale contracts here in question, Paulsen owned and operated two separate automobile service

businesses situated in the city of Port Angeles, in Clallam county. They are generally referred to as O. K. Tire Shop No. 1 and O. K. Tire Shop No. 2. On May 21, 1926, C. Wenger leased to Paulsen for a term of three years the premises in which Paulsen then and thereafter conducted his business known as O. K. Tire Shop No. 1. That lease was by its terms not assignable or the premises subject to be sublet by Paulsen without the written consent of the lessor, Wenger; by its terms Paulsen had the privilege of renewing it for an additional period of three years, and by its terms Paulsen paid in advance five hundred dollars to Wenger to apply on the rent of the latter portion of the term.

On February 25, 1927, Paulsen leased to the Standard Oil Company the premises held by him under his lease from Wenger, the oil company agreeing to pay the rental at the rate of fifty-one dollars per month. On the same day and in the same document, the Standard Oil Company subleased to Paulsen the same premises at a rental of one dollar per month. The respective terms of the tenancies of this lease and sub-lease were approximately coincident with the remainder of the term of the lease from Wenger to Paulsen. The sub-lease under which Paulsen thus held as tenant from the oil company was by its terms not assignable or the premises subject to be sublet by Paulsen without written consent of the oil company. This sub-lease by its terms contemplated the furnishing, at wholesale prices, of Standard Oil products to be sold at retail by Paulsen.

On May 28, 1928, Eric Anderson leased to Paulsen the premises on which Paulsen then and thereafter conducted his business known as O. K. Tire Shop No. 2. That lease, we may regard for present purposes, contained conditions as to rights and restrictions of

and against the lessor and lessee substantially the same as those above mentioned in the lease from Wenger to Paulsen. On the same day Paulsen leased to the Standard Oil Company, and that company subleased to Paulsen, the same premises held by Paulsen under his lease from Anderson. This sub-lease from the oil company to Paulsen we may consider, for present purposes, as of the same nature as to rights and restrictions as contained in the sub-lease from the oil company to Paulsen of the O. K. Tire Shop No. 1 premises.

On June 30, 1928, Paulsen and Gilmore entered into a sale contract in writing with reference to O. K. Tire Shop No. 1, reading as follows:

"This memorandum of agreement made this 30th day of June, 1928, by and between Paul T. Paulsen, hereinafter called the vendor, and Robert A. Gilmore, hereinafter called the vendee, Witnesseth:

"That vendor and vendee for and in consideration of the mutual promises and agreements herein contained by them to be kept, covenant and agree with each other as follows:

"Vendor agrees to sell and vendee agrees to purchase that certain business heretofore and now conducted by vendor at the corner of Lincoln and Front streets in the city of Port Angeles known as the O. K. Tire Shop. Vendor shall deliver to vendee all the pumps, equipments, furniture, fixtures and other fixed assets now used in and about the said premises and in connection with the said business and vendee shall pay to vendor therefor the sum of $3,622.20. Vendor shall further turn over and deliver to vendee all the stock of trade, tools, gasoline, oils, greases, tires, tubes and other merchandise now upon the said premises and used in connection with the carrying on of the said business for a sum equal to the present wholesale inventory value of the same.

"Vendor shall further make, execute and deliver to vendee an assignment of that certain lease covering the said premises made by C. Wenger in favor of

vendor, which said lease, it is understood, is charged with a sublease in favor of the Standard Oil Company as to a portion of said premises, and which said sublease has been reassigned by said Standard Oil Company to vendor, and in this connection vendor shall likewise make, execute and deliver to vendee an assignment of said sublease. Vendee shall pay to vendor the further sum of $500 on account of advance payments made by vendor to the said C. Wenger on account of the said leasehold.

"Vendor shall turn over all the said assets herein described free and clear from any charge, burden, lien or claim on account of wholesale dealers' accounts or otherwise, and vendor shall retain and keep as his own property all accounts receivable due the said vendor and the said business known as the O. K. Tire Shop.

"Immediately upon the execution of these presents vendor and vendee shall proceed to inventory the stock on hand at the current wholesale price thereof, and on August 1, 1928, vendee shall pay to vendor the value thereof, together with the said sum of $3,622.20, and the said sum of $500, but immediately vendee shall be entitled to take possession of all of the assets and property herein described, and vendor shall make, execute and deliver upon the payment of the said sums a good and sufficient bill of sale and conveyance transferring, conveying and setting over unto the said vendee the said assets herein described, and shall further make, execute and deliver to vendee the proper and requisite affidavits showing the said business to have no creditors, charges, liens or claims."

On the same day Paulsen and Gilmore entered into another contract in writing with reference to the sale of O. K. Tire Shop No. 2 of the same import as the contract above quoted, except as to the sale price. On July 1, 1928, an inventory was made in the presence of Paulsen and Gilmore, Gilmore taking little or no part therein other than being present and witnessing the making of the inventory; which inventory, however, did not include any agreement between Paulsen

and Gilmore as to the value of the inventoried articles, except as to only a portion of the articles.

On the same day Gilmore took charge of both tire shops, and thereafter conducted the business, whether for himself or for Paulsen pending consummation of the sale is one of the questions in this case. About July 6, 1928, Gilmore expressed his intention not to consummate the sale; this expressed intention apparently being because of the cancellation by the Firestone Tire Company of its contract for furnishing the tire shops tires at wholesale prices, the retail sale of which tires was a large part of the business.

On July 11, 1928, the controversy between Paulsen and Gilmore having commenced as to Gilmore's right to withdraw from the consummation of the purchase according to the contract, it was stipulated by their respective counsel that a large number of tires which had been furnished to the tire shops by the Firestone Tire Company, and which had not been paid for, might be removed by that company without prejudice to the rights of either Paulsen or Gilmore incident to their controversy. This was accordingly done. Paulsen received credit from the Firestone Tire Company for the value of the tires, he owing to that company more than that amount.

On August 3, 1928, which, it will be noticed, was the third day after August 1, the contract date for consummating the sale, Gilmore notified Paulsen in writing as follows:

"You are hereby notified that the undersigned refuses to consummate the proposed sale by Paul T. Paulsen, and the proposed purchase by the undersigned, of the businesses heretofore conducted by said Paul T. Paulsen at the corner of Front and Lincoln streets in Port Angeles, Washington, and known as the O. K. Tire Shop, and at the corner of Race and First streets, Port Angeles, Washington, and known

as the O. K. Tire Shop No. 2, as contemplated by those two certain memorandums entered into by said parties under date of June 30th, 1928, for the reasons that the execution of said memorandums by the undersigned was induced by misrepresentation and conspiracy; that the consideration therefor has failed; and that the vendor has failed to comply with said memorandums and deliver or tender title to the property.

"You are further notified that the undersigned is conducting said businesses subject to your orders, and hereby disavows all responsibility therefor, and demands that you assume charge thereof and that he be relieved forthwith.

"This notice is given in confirmation of the oral notice heretofore given you."

On August 8, 1928, Paulsen commenced an action in the superior court for Clallam county seeking recovery from Gilmore of a claimed balance due upon the purchase prices of the two businesses referred to in the sale contracts. This claimed balance was the contract price less the value of the tires removed by the Firestone Tire Company. That case proceeded to trial and resulted in a nonsuit and dismissal as against Paulsen, but without prejudice. On October 10, 1928, the controversy between Paulsen and Gilmore still being unsettled, Gilmore not having paid anything upon the purchase price, it was stipulated between them by their respective counsel that the business conducted at Tire Shop No. 2 should be sold for the sum of $1,250, but without prejudice as to the ultimate rights of either. Paulsen received this sum for that sale.

On May 21, 1929, this action was commenced by Paulsen, he claiming the entire agreed purchase price under both sale contracts, less the value of the tires returned to the Firestone Tire Company and less the amount of the sale of the shop No. 2 business. Gilmore remained in charge of the business, claiming that

he did so only for Paulsen, who at all times refused to take the business over and assume charge of it. The trial court made very elaborate detailed findings. For present purposes we think it is sufficient to notice only the following portions of paragraph 10 of the court's findings:

"That from the 2nd day of July, 1928, and up to and including the 1st day of August, 1928, the defendant remained in possession and charge of said business, as provided in said contracts, but that the said plaintiff, during all of said time, remained away from said business and from this defendant. That during all of said time the plaintiff wholly failed to comply with the conditions precedent as provided for in said contracts to be done, kept and performed by said plaintiff, to wit:

". . . that plaintiff wholly failed to execute or deliver any assignment or assignments of the subleases between it and said Standard Oil Company . . . and wholly failed to procure from said Standard Oil Company any written consent from said Standard Oil Company to such assignment . . . and wholly failed to procure from said C. Wenger or said Eric Anderson any written consent for said subleases . . .; that plaintiff wholly failed to make, execute and deliver to the defendant the proper and requisite affidavits showing said business to have no creditors; . . . the plaintiff wholly failed to make, execute and deliver good and sufficient, or any, bill of sale or conveyance transferring to the defendant said business and the assets thereof; and the plaintiff wholly failed to make any tender to the defendant of any of the papers, documents or muniments of title provided for in said contracts at any time, or at all, until the same were tendered into court upon the trial of this suit."

These findings, we think, are supported by the evidence. In any event we cannot decide that the evidence does not preponderate in support of these findings.

240

The principal contention here made in behalf of Paulsen is that the sale contracts constituted, within themselves, a consummation of the sales and the passing of title to the property and property rights at the time of the execution of the sale contracts of June 30, 1928, and that the transactions thereby became, in legal effect, sales upon credit. There is invoked in support of this contention the following provisions of sections of our uniform sales act, chapter 142, Laws of 1925, p. 363 (Rem. 1927 Sup., §§ 5836-18, 5836-19):

"Sec. 18. Property in Specific Goods Passes When Parties So Intend.

"(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case.

"Sec. 19. Rules for Ascertaining Intention. Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

If these sale contracts contemplated only the sale and purchase of the physical property therein mentioned, we may concede there would be substantial ground for arguing that they contemplated only the sale and purchase of "specific goods in a deliverable state." However, the goods contracted to be sold and purchased under these sale contracts constituted only a non-

severable portion of the property of each business contracted to be sold and purchased. Gilmore was not only to receive good title to the goods, but also good title to each business and its leasehold tenancy. The leasehold tenancies were not, we think, "goods in a deliverable state," within the meaning of our sales act.

We agree with the trial judge that the sale contracts were, in legal effect, only executory, and did not by their execution result in passing title of the property from Paulsen to Gilmore.

Did the taking charge by Gilmore of the business consummate the passing of title from Paulsen to Gilmore of the property contracted to be sold and purchased? Such might possibly have been the result had the physical property alone been the subject of the sale contracts; but we have seen that very important additional property and property rights were to be vested in Gilmore by Paulsen, that is, the leasehold tenancies, not only by proper assignments from Paulsen, but, which was of equal importance to Gilmore, the procuring of the assent to such assignments by Wenger, Anderson and the Standard Oil Company. We are of the opinion that, under these circumstances, Gilmore's taking charge of the business did not have the legal effect of passing the title to the property from Paulsen to Gilmore. In this connection, we are also of the opinion, that, under the circumstances shown, the remaining of Gilmore in charge of the business did not at any time result in passing the title thereto from Paulsen to him.

Contention is made in behalf of Paulsen that Gilmore's declared intention not to consummate the purchase on his part under the contracts constituted such a breach thereof as to obviate the necessity of Paulsen's making tender of performance, particularly

as to the delivery of documents which would effectively vest title to the property in Gilmore. In support of this contention, there is invoked the general rule as to the effect of a party to an executory contract declaring his intention not to perform his contractual obligation before the agreed time for its performance. Such a declaration may constitute what is called an "anticipatory breach" of the contract, enabling the other party to sue the party so declaring for damage because of such breach, even before the contract time of performance by such party arrives. 6 R. C. L. 1023, 1024; 1 Black on Rescission and Cancellation, § 204.

In this connection, we are to remember that this is not an action for damages for any alleged breach of the sale contracts on the part of Gilmore, but is an action seeking recovery from him of an alleged unpaid portion of the contract purchase prices. We do not think it can be seriously argued that, in an action of this nature, the vendor is entitled to recover the entire purchase price without an effective vesting in his vendee of the entire property, the entire purchase price of which is sought to be recovered. The rule invoked, as we understand it, is narrow in its application. Its purpose manifestly is simply to enable a party to sue for damages for breach of a contract by the other party before the contracted time for his performance arrives. We fail to see how the rule can have any application in an action for recovery of the purchase price not involving any question of damages for breach of the contract.

█ Further contention is made in behalf of Paulsen, as we understand his counsel, in substance, that at all events the tender of performance, that is, tender of proper documents constituting muniments of title which would vest good title to all the property,

including the leasehold tenancies, in Gilmore, was sufficiently made to Gilmore, even at the trial of this case, to entitle Paulsen to recover the entire agreed purchase price. We are of the opinion that, under all the circumstances here appearing, Gilmore was not required to accept such tender at that late day.

Some other contentions are made by counsel for Paulsen, none of which we have overlooked. They are, however, as we view them, almost wholly questions of fact, or inferences of fact to be drawn from the evidence. We deem it sufficient to say that we do not regard them of sufficient weight to lead us to any different conclusion than we have thus far expressed.

We conclude that the judgment must be affirmed. It is so ordered.

MITCHELL, C. J., MAIN, TOLMAN, and HOLCOMB, JJ., concur.